1
2
3                    UNITED STATES DISTRICT COURT
4                           DISTRICT OF NEVADA
5                                  * * *
6   DAVID BURNS,                          Case No. 3:22-cv-00021-MMD-CLB
7                          Petitioner,              MERITS ORDER
8       v.
9   JEREMY BEAN,[1] *et al.*,
10                        Respondents.
11
12  **I.    SUMMARY**

13          Petitioner David Burns was sentenced in Nevada state court to life without the

14  possibility of parole after a jury found him guilty of conspiracy to commit robbery,

15  conspiracy to commit murder, burglary while in possession of a firearm, robbery with the

16  use of a deadly weapon, murder with the use of a deadly weapon, attempted murder with

17  the use of a deadly weapon, and battery with the use of a deadly weapon. (ECF No. 46-

18  11.) This matter is before the Court for adjudication of the merits of Burns's First Amended

19  Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 in which he alleges that his

20  counsel was ineffective; the trial court erred by denying his motion to suppress, overruling

21  his objections to prosecutorial misconduct, submitting a video recording to the jury, and

22  denying his challenges to discriminatory voir dire practices; his sentence was cruel and

23  unusual; and there were cumulative errors. (ECF No. 19 ("First Amended Petition").)

24
25  ───────────────
26          [1]According to the Nevada Department of Corrections, Burns is incarcerated at High
    Desert State Prison. Jeremy Bean is the current warden for that facility. At the end of this
27  Order, the Court kindly directs the Clerk of Court to substitute Jeremy Bean as a
    respondent for Respondent Warden Russell. *See* Fed. R. Civ. P. 25(d).
28

1  Respondents answered the First Amended Petition, and Burns replied. (ECF Nos. 71,
2  72.)

3  Burns moved for an evidentiary hearing on his First Amended Petition. (ECF No.
4  74 ("Motion").) Respondents opposed the Motion, and Burns replied. (ECF Nos. 75, 76.)

5  For the reasons discussed below, the Court denies the First Amended Petition and
6  the Motion and grants a Certificate of Appealability for ground 1d.

7  **II.    BACKGROUND**

8      **A.    Factual Background**[2]

9  Erica Newman (hereinafter "Erica") testified that she spent the night on August 6,
10  2010 into August 7, 2010, when she was 11 or 12 years old, at the apartment where her
11  sister, Derecia Newman, lived with her boyfriend, Cornelius Mayo, and their four children
12  in Las Vegas, Nevada. (ECF Nos. 44-10 at 63-64, 66-67, 91.) Erica, who was sleeping in
13  a bedroom with the three younger children, woke in the middle of the night to gunshots.
14  (*Id.* at 72.) Erica saw a man, who was "medium build, maybe skinny," tall, black, and
15  wearing overalls and a hat, standing by the master bedroom with a gun.[3] (*Id.* at 73, 80.)
16  Erica then saw her sister dead on the couch. (*Id.* at 75.) According to Erica, both Newman
17  and Mayo sold drugs from the apartment. (*Id.* at 83.)

18  Las Vegas Metropolitan Police Department ("LVMPD") Officer Curtis Atwood
19  testified that he was the first person to respond to the scene of the shooting. (ECF No.
20  44-10 at 93-95.) After entering the apartment, he found "a female [who] was obviously
21  shot and deceased on the couch" and a little girl who was later identified as 11-year-old
22  D.N. shot in the abdomen in the master bedroom. (*Id.* at 95-96.) The medical examiner

23

24      [2]The Court makes no credibility or other factual findings regarding the truth or
25  falsity of this evidence from the state court. The Court's summary is merely a backdrop
    to its consideration of the issues presented in the First Amended Petition.

26      [3]When Erica was interviewed by police, she only said that she "saw a gun but didn't
27  see the man." (ECF No. 44-10 at 84.)

28

testified that Newman was shot in the head and that "the end of the barrel was in contact with her forehead when the shot was fired." (ECF No. 45-1 at 10, 19, 23.) D.N.'s injuries to her abdomen were severe, resulting in her hospitalization for approximately three months. (ECF No. 45-3 at 4, 14, 17.)

LVMPD Police Officer Jonathan Houghton, who also responded to the scene, testified that he was tasked with "watch[ing] Cornelius Mayo to make sure he didn't leave the scene prior to detectives conducting their investigation." (ECF No. 44-10 at 105-06.) Officer Houghton observed Mayo using his cell phone and could hear a woman's voice on the other end of the line. (*Id.* at 106.) Officer Houghton heard Mayo tell the woman, "You know who did this. I'm going to bring all my niggas." (*Id.* at 107.) Officer Houghton asked Mayo who he was speaking to, and Mayo said he was speaking to Stephanie Cousins. (*Id.* at 108.) Mayo then explained to Officer Houghton that Cousins had asked Newman if she could come over, Newman agreed, Cousins came over and knocked on their door, Newman answered the door, and two men "stormed in." (*Id.* at 108.) Mayo, who was in the bathroom during the incident, then heard gunshots. (*Id.* at 108, 114-15.)

Mayo testified that Cousins called the apartment's landline at 3:39 a.m. on August 7, 2010 and spoke with Newman regarding bringing over some marijuana. (ECF No. 45-9 at 212, 218-19, 297.) Cousins called back ten minutes later while Mayo was in the bathroom. (*Id.* at 220.) The next thing Mayo heard was screaming and commotion, Cousins saying "no," and then gunshots. (*Id.* at 221.) D.N. ran from the living room, where she had been on the couch, into the bathroom with Mayo and shut the door. (*Id.*) Mayo asked D.N. what was going on, and "right when [he] said that, somebody shot through the [bathroom] door." (*Id.* at 223.) D.N. opened the bathroom door and got shot in the stomach. (*Id.*) Mayo called 911, went to check on the other children in the bedroom across the hall, and then walked to the living room where he "saw Derecia sitting on the couch with half her face gone." (*Id.* at 225-26.) While on the phone with Cousins after the

incident, Cousins told Mayo that "when she came to knock on the door[,] two dudes came from around the corner" and entered the apartment. (*Id.* at 230.)

D.N. testified that she woke up in the early morning hours of August 7, 2010 and went into the living room, where she saw her mom answer the door. (ECF No. 45-10 at 93-94, 98-100.) Cousins "came in and [Newman] told her to close the door, [but] she didn't." (*Id.* at 101.) A man then "pushed the door open and entered and shot her" mom in the face. (*Id.*) D.N. ran down the hallway into her mom's bedroom and into the bathroom and "tried to close the bathroom door." (*Id.* at 102.) As D.N. "was trying to close the door, [she] got shot in the stomach." (*Id.*) The shooter then "check[ed her] pockets looking for something" before leaving. (*Id.* at 103.) According to D.N., the man, who had curly hair, was wearing "an orange cap," overalls, and a mask. (*Id.* at 106, 133, 137.)

Monica Martinez testified that, in the early morning hours of August 7, 2010, she drove two men—Willie Mason, who went by the name "G-Dogg," and Burns, who went by the "D-Shock"—both of whom were associates of her boyfriend, Jerome Thomas, to meet up with Cousins. (ECF No. 45-1 at 27-28, 62-64.) Cousins got into Martinez's car, and Cousins and the men discussed potential people to rob. (*Id.* at 70.) Cousins offered the opportunity to rob Newman, her drug dealer, because there was only one man there and no weapons. (*Id.* at 73, 82.) As Martinez was driving the men and Cousins to Newman's apartment, Burns "said he wasn't going . . . home empty-handed, and he was basically going to go in there shooting." (*Id.* at 74.) After arriving at Newman's apartment, Cousins, Burns, and Mason exited the car, and the next thing Martinez heard was screaming and then four gunshots. (*Id.* at 83-84.) Following the shooting and the three reentering Martinez's car, Martinez dropped Cousins off at her apartment, and Burns said that "he should have killed" Cousins too. (*Id.* at 84-88.) Martinez then dropped Mason and Burns off at Thomas's apartment where they were staying. (*Id.* at 89.) Thomas told Burns to take a shower "[t]o get rid of any blood that was on him," and then Thomas wiped down the

1    gun that he had loaned to Burns. (*Id.* at 93-94.) Thomas later gave the gun to a friend for

2    disposal. (ECF No. 45-4 at 142.) That friend testified that Thomas told him that Mason

3    was the shooter, but he acknowledged that he had previously told police that Thomas did

4    not say which of the men was the shooter. (*Id.* at 162, 166, 180-183.)

5         **B.    Procedural Background**

6         Following the 16-day trial, the jury found Burns guilty of conspiracy to commit

7    robbery, conspiracy to commit murder, burglary while in possession of a firearm, robbery

8    with the use of a deadly weapon, murder with the use of a deadly weapon, attempted

9    murder with the use of a deadly weapon, and battery with the use of a deadly weapon.

10   (ECF No. 46-11.) Burns was sentenced to, *inter alia*, life without the possibility of parole.

11   (*Id.*) Burns did not file a direct appeal.[4]

12        Burns filed a state post-conviction petition on October 13, 2015. (ECF No. 46-13.)

13   The state court denied the petition on March 14, 2016. (ECF No. 47-3.) Burns appealed,

14   and the Nevada Supreme Court reversed and remanded, finding that "the district court

15   abused its discretion in denying the petition without appointing counsel." (ECF No. 47-

16   11.) Burns filed a counseled supplemental state post-conviction petition on November 27,

17   2017. (ECF No. 47-15.) The state court denied the supplemental petition on October 25,

18   2018. (ECF No. 47-24.) Burns appealed, and the Nevada Supreme Court affirmed in part,

19   reversed in part, and remanded, finding that Burn's counsel performed deficiently in not

20   filing a direct appeal and that Burns was prejudiced. (ECF No. 48-10.) The Nevada

21   Supreme Court "conclude[d] that the district court erred in not granting the petition as to

22   this claim and providing the relief set forth in NRAP 4(c)." (*Id.* at 9.) The state court then

23   entered an order directing a notice of appeal regarding Burn's judgment of conviction.

24

25        [4]During the middle of his capital trial, Burns and the prosecution reached a
     stipulation: in the event of a conviction for first-degree murder, the prosecution agreed to
26   waive its right to seek the death penalty against Burns, and, in exchange, Burns agreed
     to a sentence of life without the possibility of parole and "to waive all appellate rights
27   stemming from the guilt phase of the trial." (ECF No. 45-11.)

28                                                  5

1  (ECF No. 48-13.) Following briefing, the Nevada Supreme Court affirmed Burn's

2  judgment of conviction on September 23, 2021. (ECF No. 48-34.)

3          Burns commenced this federal habeas action on or about January 13, 2022. (ECF

4  No. 1.) The Court appointed counsel for Burns, and Burns filed his instant counseled First

5  Amended Petition on December 22, 2022. (ECF Nos. 8, 14, 19.) Respondents moved to

6  dismiss the First Amended Petition. (ECF No. 36.) The Court granted the motion, in part,

7  as follows: (1) finding that grounds 2, 4, and 6 were procedurally defaulted and deferring

8  consideration of cause to overcome the procedural default of these grounds until first

9  determining whether Burns's counsel was ineffective in ground 1(d); (2) finding that

10  ground 7 was unexhausted to the extent it relied on his direct appeal claims; and (3)

11  dismissing ground 5 to the extent it relies on the Nevada Constitution. (ECF No. 53.)

12  Burns abandoned the unexhausted portion of ground 7. (ECF Nos. 59, 60.) Respondents

13  filed their Answer on September 11, 2024, and Burns filed his reply on October 11, 2024.

14  (ECF Nos. 71, 72.)

15  **III.    STANDARD OF REVIEW**

16          28 U.S.C. § 2254(d)[5] sets forth the standard of review generally applicable in

17  habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

18  _____

19          [5]Burns argues that the Antiterrorism and Effective Death Penalty Act ("AEDPA") is
unconstitutional because it infringes upon the separation of powers and the independence
20  of the federal judiciary. (ECF No. 72 at 3.) Burns acknowledges that the Ninth Circuit has
previously rejected a constitutional challenge to 28 U.S.C. § 2254(d). *See Crater v.*
21  *Galaza*, 491 F.3d 1119, 1129 (9th Cir. 2007) ("The constitutional foundation of §
2254(d)(1) is solidified by the Supreme Court's repeated application of the statute.").
22  However, Burns argues that *Crater* is irreconcilable with the Supreme Court's recent
decision in *Loper Bright*.

23
        In *Loper Bright v. Raimondo*, the Supreme Court overruled *Chevron U.S.A. Inc. v.*
24  *Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), dealing with the deference owed to
agency interpretations of ambiguous statutes. 603 U.S. 369, 378-79 (2024). While
25  portions of the underlying reasoning in *Loper Bright* could be analogous in the AEDPA
context—for example, if *Chevron* deference is contrary to the principles of federal judicial
26  independence, then so, too, would be AEDPA deference—Burns fails to demonstrate that
*Loper Bright* has been—or will be—extended to overturn AEDPA. Rather, at this time,

27

28                                                      6

1
2
3

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

4
5

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

6
7
8

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9
10
11
12
13
14
15
16
17
18
19
20
21

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

22
23
24
25

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for

26
27

*Crater* is binding circuit authority, and, given that *Crater* is not irreconcilable with *Loper Bright*, the Court rejects Burns's constitutional challenge.

28

relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

## IV.    DISCUSSION

### A.    Ground 1: Ineffective Assistance of Counsel

In ground 1, Burns alleges that he was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. (ECF No. 19 at 7.)

#### 1.    Standard For Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See* 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

8

In reviewing a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply, so review is doubly deferential. *See Richter*, 562 U.S. at 104-05. Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* at 105.

### 2.    Ground 1a—Exculpatory Information Concerning Mayo

In ground 1a, Burns alleges that his counsel failed to discover or challenge the State's withholding of exculpatory information concerning Mayo. (ECF No. 19 at 7.)

### a.    Background

Before trial, Burns's counsel moved to compel disclosure of exculpatory evidence. (ECF No. 38-29.) In that motion, Burns's counsel specifically requested the following: "[d]isclosures of any and all . . . express or implied promises of favorable treatment or leniency, or any other benefit that any of the State's witnesses received in exchange for their cooperation with this prosecution." (*Id.* at 10.)

On February 5, 2015, day ten of the trial, Mayo testified for the prosecution. (ECF No. 45-9 at 212.) During cross-examination, Mayo testified that he was currently facing charges for drug trafficking, child neglect with substantial bodily harm, and allowing children to be present where drug laws were being violated. (*Id.* at 249, 251.) When asked if those charges were being postponed until after Burns's trial, Mayo responded, "I guess. I'm not for sure. I don't know." (*Id.* at 251.) The following colloquy then took place:

> Q.    Well, do you believe that by testifying in this case it helps you in the cases that you're facing right now?
> A.    No.
> Q.    You don't think it helps you?
> A.    No.
> Q.    Do you think that the DA indefinitely postpones cases all the time, or do you think you're getting some - -
> A.    I don't know how the DA work.
> Q.    Okay. Let me finish my question, okay. Do you believe that the DA is just postponing these cases coincidentally and that they're not giving you any sort of favor because you're testifying in this case? Is that what you think?

9

A.      I don't think they giving me no type of favor.

(*Id.* at 251-52.)

In November 2010, Mayo was charged with the following crimes regarding the incidents that took place on August 7, 2010: child abuse and neglect, allowing a child to be present where the Uniform Controlled Substances Act was being violated, and trafficking in a controlled substance. (ECF No. 20-5 at 12-13.) On September 1, 2015, approximately seven months after Burns's trial, Mayo entered into a plea agreement whereby he agreed to plead guilty to conspiracy to violate the Uniform Controlled Substances Act in return for the State dropping the other charges and not opposing probation. (*Id.* at 63.) Mayo's judgment of conviction was entered on February 4, 2016. (*Id.* at 71.)

### b.      State Court Determination

The Nevada Supreme Court denied this claim as follows:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,*100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
> . . . .
> Burns next argues that counsel should have challenged the State's withholding of exculpatory information regarding inducements given to a witness. The witness testified that he received no benefit from the State in his separate, pending prosecution in exchange for his testimony; Burns has not identified any evidence to the contrary; and counsel cross-examined the witness on his pending prosecution and its delay. Burns' contention that the witness received a "sweetheart deal" is mere speculation that does not establish that counsel deficiently failed to uncover it. *See Hargrove v. State,*

10

100 Nev. 498, 502, 686 P.2d 222, 225 (1984). The district court therefore did not err in denying this claim.

(ECF No. 48-10 at 2-3.)

### c.    Analysis

The Nevada Supreme Court reasonably determined that Burns fails to demonstrate that his counsel acted deficiently. The Court acknowledges that Burns's counsel had a duty to investigate and question whether an agreement—either explicit or implicit—had been discussed or reached by the State and Mayo regarding his testimony. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (determining that a witness's credibility was "an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"); *see also Silva v. Brown*, 416 F.3d 980, 987 (9th Cir. 2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."). Contrary to Burns's contention, his counsel completed these tasks by moving for the State to disclose any such agreement with Mayo and then cross-examining Mayo extensively about the presence of an agreement. It is unclear what more Burns's counsel could have done in this situation.

Moreover, as the Nevada Supreme Court reasonably noted, it is mere speculation that there was exculpatory information to discover given that Burns fails to demonstrate that an agreement between the State and Mayo was in place or had been contemplated. Burns argues that the following evidence establishes evidence of such a *quid pro quo*: (1) the State initially requested bail be set for Mayo at $60,000, but they later agreed for him to be released on his own recognizance; (2) the State delayed prosecuting Mayo for over four years; (3) within months after testifying against Burns, the State entered into an extremely favorable plea agreement for Mayo; and (4) Mayo risked exposure to criminal punishment by testifying without an agreement with the State in place. (ECF No. 72 at

11

19.) While these facts may suggest the presence of an agreement, they do not rise to the level of proving an agreement.

Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable factual determination, Burns is not entitled to federal habeas relief on ground 1a.

### 3.    Ground  1b—Opened  Door  to  Damaging  Identification Evidence

In ground 1b, Burns alleges that his counsel opened the door to damaging and otherwise inadmissible evidence regarding Cousins' identification of him, which was harmful to his defense that Thomas was the shooter. (ECF No. 19 at 10.)

#### a.    Background

During cross-examination of Detective Christopher Bunting, Burns's counsel asked Detective Bunting if Mayo told him that "the assailant in this case had on a white T-shirt." (ECF No. 46-3 at 26.) Detective Bunting responded that Mayo did not tell him that, so Burns's counsel followed up by asking, "He told others that and you learned of it later?" (*Id.*) Detective Bunting responded, "I know he didn't see the shooter, so I don't know what he told the other detectives." (*Id.*) On redirect examination, the prosecution indicated that Burns's counsel had asked him whether he heard that "[t]he shooter was wearing a white T-shirt." (*Id.* at 36.) The prosecution then asked whether "Stephanie Cousins made an identification of the shooter," and, after responding in the affirmative, Detective Bunting testified that Cousins did not identify Thomas as the shooter. (*Id.*) In response, during recross examination, Burns's counsel asked Detective Bunting about Cousins saying that the "shooter was a man that went by the moniker of Job-Loc," which was later identified as being Thomas's nickname. (*Id.* at 57.) Detective Bunting confirmed that Cousins had stated the shooter's name was Job-Loc. (*Id.*) To refute this point, the

12

prosecution asked Detective Bunting whether Cousins picked out Burns in a photographic lineup as being the shooter, and he responded in the affirmative. (*Id.* at 61.)

Later, during closing arguments, Burns's counsel made the following statements:

> The other thing is we have Erica Newman for the first time announcing overalls. Well, that's odd, isn't it? And the white T-shirt. Okay. Why is the white T-shirt important? I'll tell you why. Because if you believe . . . that David Burns was the shooter in this case, you would find that that white T-shirt description is not accurate. Right. He's wearing a blue shirt in the [surveillance] video.
> White T-shirt comes from Stephanie Cousins. Right. And white T-shirt remains an error. If you believe David Burns is the shooter, white T-shirt is used as a descriptor from the beginning of the case all the way through. We're not suggesting that she got everything right but she got the T-shirt wrong so you have to acquit. We're saying that this is evidence of the suggestion of information.

(ECF No. 46-5 at 44-45.)

### b.    State Court Determination

The Nevada Supreme Court denied this claim as follows:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of t.)he inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
> . . . .
> Burns next argues that counsel should not have opened the door to a detective's testimony regarding Ms. Cousins' identification of the shooter and should have challenged her out-of-court identification as hearsay. Decisions regarding what witnesses to call or how to question them in developing the defense are tactical decisions that rest with counsel. *Rhyne v. State,* 118 Nev. 1, 8, 38 P.3d 163, 167 (2002). Counsel made a strategic decision to elicit Cousins' statement that the shooter was wearing a white shirt, as counsel had argued that other evidence showed that Burns was not wearing a white shirt earlier that night. Counsel's tactical decisions are

13

virtually unchallengeable absent a showing of extraordinary circumstances, which Burns has not made. *See Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 (2004). The State then elicited on redirect examination further details from Cousins' identification of the shooter that Burns argues were disadvantageous. Counsel was not deficient in omitting a hearsay challenge that was futile by reason of counsel's cross-examining the detective on Cousins' identification first. *See. McKenna v. State,* 114 Nev. 1044, 1056, 968 P.2d 739, 747 (1998) (citing *Taylor v. State,* 109 Nev. 849, 860, 858 P .2d 843, 850 (1993) (Shearing, J., concurring in part and dissenting in part)). Further, Burns has not shown a reasonable probability of a different outcome had counsel questioned Cousins differently. The district court therefore did not err in denying these claims.

(ECF No. 48-10 at 2-3, 4.)

### c.    Analysis

The Nevada Supreme Court reasonably determined that Burns fails to demonstrate that his counsel acted deficiently. As the Nevada Supreme Court reasonably noted, strategic decisions by counsel are entitled to deference. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); *Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions."). Here, Burns's counsel made the sound decision to introduce evidence that Cousins said (1) the shooter was wearing a white t-shirt, which was favorable to Burns given that he was seen wearing a blue t-shirt the night of the shooting, and (2) the shooter's name was Job-Loc, Thomas's nickname, which is to whom the defense was attempting to shift blame. While this decision led to the prosecution eliciting hearsay testimony that Cousins identified Burns as the shooter from a lineup, it cannot be determined that this decision "fell below an objective standard of reasonableness." Burns's counsel needed to obtain evidence to support his defense, and opening the door to unfavorable evidence in that process was a reasonable risk under the circumstances

14

and is entitled to deference. Because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable determination of the facts, Burns is not entitled to federal habeas relief on ground 1b.

### 4.    Ground 1c—Failure to Challenge Prosecutorial Misconduct

In ground 1c, Burns alleges that his counsel failed to challenge prosecutorial misconduct during closing arguments. (ECF No. 19 at 13.)

### a.    Background

First, during rebuttal closing arguments, in response to the defense's suggestion that the prosecution was "manipulating the witnesses," the prosecution argued:

> It would be a wonderful situation should we be standing in - - or we should be living in a world in which people who are selling crack out of their house who get murdered happen to have a priest and a nun who's standing there and is part of the witnesses in the case. Or maybe Mother Theresa to tell us who's living in Job-Loc's apartment over at the Brittnae Pines.
> Those aren't the people that are involved in murders. I don't get to choose these people. There's no doubt that these are these two individuals' friends. They're not my friends. These are people that are associated with these two defendants. You can't blame us for the quality of the witnesses.

(ECF No. 46-5 at 54-55.)

Second, later in the prosecution's rebuttal closing argument, in discussing the cell tower evidence, the prosecution argued the following:

> Why is she hitting this tower when she's up here and then down there? You only have to ask yourself, remember the guy from T-Mobile, the expert that talks about you don't always hit the closest tower if there's obstructions? Well, what do you know, she calls from right outside that door.

(*Id.* at 87.)

Third, at the end of the prosecution's rebuttal closing argument, it discussed Burns's behavior during his police interview and made an argument linking that behavior to the murder:

> And when you're in an interview room with detectives and you get told about it, your behavior of humming and singing and whistling is really

15

kind of offensive, to be honest with you. And you can't really blame the cops for using the kind of terms that they used with him.

But it's also relevant for something else. Because Cornelius Mayo's inside that shower when the shots ring out. And he calls 911. So whoever shot Derecia Newman and then put a bullet in [D.N.] . . . whoever that shooter is, he's whistling as he's going through the crack cocaine and the drugs inside that residence as Cornelius Mayo, in that very small bathroom in that shower, is calling 911. Listen to that 911 over and over and over again. Cornelius Mayo doesn't see [D.N.] until after the whistling ends.

And when you get to walking to a - - someone's apartment here, whether they're a drug dealer or they're not a drug dealer, when you walk in and you place a .44-caliber revolver against their head and blow half their face off, chase down their 12-year-old daughter, shoot her in the stomach, rifle through her pockets, and then get up and whistle, that is a cold, calculated murder. This is first-degree murder.

(*Id.* at 95-96.)

Burns's counsel did not object to any of these three arguments.

### b.    State Court Determination

The Nevada Supreme Court denied this claim as follows:

To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,*100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

. . . .

Burns next argues that counsel should have challenged the prosecutor's misconduct during rebuttal argument. Counsel did not perform deficiently in omitting the argued-for objections, which would have been futile where the State's arguments were not improper. The State's argument that it would have preferred that its witnesses were a priest and a nun was a permissible argument regarding the credibility of the State's witnesses. *See Rowland v. State,* 118 Nev. 31, 39, 39 P.3d 114, 119 (2002). The State did not shift the burden to Burns in commenting that he had no explanation for the crime, rather it permissibly commented on the brutal nature of the offense, i.e., that the killing could not be justified. *See Browne v. State,* 113 Nev. 305, 311, 933 P.2d 187, 191 (1997). The State's reference to the

cellular record custodians as experts was not improper because the custodians were properly noticed as experts. Insofar as the State's discussion of the whistling heard in the background of the 911 call and Burns' humming during his police interview may be construed as arguing that the same person made both sounds, such argument was a permissible comment on matters within evidence. *See Jimenez v. State,* 106 Nev. 769, 772, 801 P.2d 1366, 1368 (1990). The district court therefore did not err in denying these claims.

(ECF No. 48-10 at 2-3, 5.)

### c.    Analysis

The Nevada Supreme Court reasonably determined that Burns fails to demonstrate his counsel acted deficiently given that none of the prosecution's arguments were improper, thus warranting an objection.

Regarding the first argument, Burns contends that the prosecutor improperly argued that the State should not be required to meet its burden of proof because the State's witnesses were not upstanding pillars of the community. (ECF No. 19 at 13.) This contention takes the prosecution's statement entirely out of context. The prosecution soundly contextualized its comments about its witnesses not having the utmost credibility as being a direct response to the defense's suggestion that the prosecution was manipulating the witnesses. This was permissible. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."). And, as the Nevada Supreme Court reasonably explained, the prosecution's comment was merely commentary on its own witnesses' credibility, or lack thereof—it did not veer into burden shifting territory. Indeed, the prosecution never insinuated or implied that it should have a lower burden of proof merely because its witnesses lacked credibility.

As to the second argument, Burns contends that the T-Mobile witness was a custodian of records, not an expert, so the prosecution calling him an expert improperly bolstered his credibility. (ECF No. 19 at 13.) The State's T-Mobile witness's testimony amounted to expert witness testimony under Nevada law. *See Burnside v. State*, 352

1    P.3d 627, 632 (Nev. 2015) (holding that "the cell phone company employee's testimony

2    related to how cell phone signals are transmitted constituted expert testimony because it

3    required specialized knowledge."). Consequently, the Nevada Supreme Court reasonably

4    found that the prosecution's description of him as an "expert" was proper.

5           As to the third argument, Burns contends that this argument regarding the whistling

6    and humming was not supported by the evidence. (ECF No. 19 at 14.) On direct

7    examination, Detective Bunting testified he could hear whistling in Mayo's 911 call at the

8    same time Mayo was speaking. (ECF No. 46-2 at 23-24.) Later, the prosecution asked

9    Detective Bunting about his interview with Burns. (*Id.* at 61.) The prosecution played the

10   recording for the jury. (*Id.* at 62.) The prosecutor asked Detective Bunting to describe

11   Burns during the interview, and Detective Bunting responded, "he was slouching far into

12   his chair. And as you heard was - - was humming while we were asking him questions.

13   And then just kind of looking off or away. Just disinterested for the most part." (*Id.* at 71-

14   72.) A prosecutor may "argue inferences from the evidence and offer conclusions on

15   contested issues." *Jones v. State*, 937 P.2d 55, 63 (Nev. 1997); *see also Drayden v.*

16   *White*, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that "the prosecutor's statements

17   were supported by the evidence and reasonable inferences that could be drawn from the

18   evidence"). Given that the prosecution argued a conclusion—i.e., that Burns was the

19   killer—based on an inference from evidence admitted in the case (i.e., the whistling heard

20   on the 911 call and the humming heard during Burns's police interview being from the

21   same person), the Nevada Supreme Court reasonably found that the prosecution's

22   comment was permissible.

23          Because the Nevada Supreme Court's determination constituted an objectively

24   reasonable application of *Strickland*'s performance prong and was not based on an

25   unreasonable determination of the facts, Burns is not entitled to federal habeas relief on

26   ground 1c.

27

28

**5.      Ground 1d—Failure to Move to Strike Death Penalty**

Burns alleges his counsel failed to move to strike the death penalty based on his intellectual disability and fetal alcohol syndrome, explaining that he was prejudiced by this failure because, if the trial court had found him ineligible for the death penalty, he would have never have agreed to stipulate to abandoning certain appeals rights in the middle of trial in return for the prosecution taking the death penalty off the table. (ECF No. 19 at 15, 18.)

**a.      Background**

Before trial, Burns's counsel moved unsuccessfully to strike the notice of death penalty: the first time based on "[t]he State's charging document fail[ing] to identify or validate the alleged aggravating circumstances," and the second time "based on the cost of capital punishment and attendant policy considerations." (ECF No. 37-29 at 4; ECF No. 38-42 at 2.) Notably, Burns's counsel never moved to strike the notice of death penalty based on him being ineligible to be put to death.

Burns's counsel obtained the following three reports on Burns's psychological conditions. These reports, which Burns now argues should have been utilized to invalidate the notice of death penalty, were included within Burns's counsel's sentencing memorandum. (*See generally* ECF No. 22-2.)

First, Richard S. Adler, M.D. completed a forensic psychiatric examination of Burns on July 23, 2013 and completed his report of the examination on January 16, 2015. (ECF No. 22-2 at 9.) Dr. Adler included the following findings, among others, in his report: (1) Burns has Alcohol-Related Neurodevelopmental Disorder, (2) "Burns's intellectual functioning . . . demonstrated intellectual functioning that was broadly within the average range (FSIQ = 93)," and (3) regarding adaptive functioning, Burns "is reported to be performing much more poorly than would be expected both based on his age and his level of intellectual functioning as measured by IQ testing." (*Id.* at 10, 17, 18, 32.)

19

Second, Natalie Novick Brown, PhD completed a Lifelong Functional Assessment of Burns and reported, *inter alia*, that (1) "[r]eview of contemporaneous records across the lifespan, forensic reports from other experts, and clinical interview with Mr. Burns indicate a life history that is consistent with" Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure and Alcohol-Related Neurodevelopmental Disorder, and (2) Burns's Fetal Alcohol Spectrum Disorders "affected his ability to appreciate the criminality of his conduct and conform his conduct to the requirements of the law." (ECF No. 22-2 at 117, 119.)

Third, Paul D. Connor, PhD completed a neuropsychological assessment of Burns on December 20, 2012 and reported, *inter alia*, that (1) "[b]ased on the pattern of Mr. Burns's deficits, a Neurodevelopmental Disorder diagnosis is appropriate," (2) "his functioning is quite consistent with past research and with current guidelines for diagnosis of" Fetal Alcohol Spectrum Disorder, and (3) "Burns's pattern of current neuropsychological functioning is entirely consistent with guidelines for the diagnosis of [Fetal Alcohol Spectrum Disorder] and as such a diagnosis of Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure is appropriate." (ECF No. 22-2 at 131.)

Burns's counsel testified at the post-conviction evidentiary hearing that the defense team "was always trying to get the death penalty off the table some way, shape, or form." (ECF No. 47-22 at 7.) Burns's counsel then testified that he "didn't ever perceive any significant misunderstanding" on Burns's part. (*Id.* at 15.) Burns's other counsel described Burns as follows: "He was actually a very, very nice client to deal with. He was very cordial, very courteous, and we understood each other. There was no difficulty whatsoever." (*Id.* at 31.)

### b.    State Court Determination

The Nevada Supreme Court denied this claim as follows:

20

To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

. . . .

Burns next argues that counsel should have argued that he was ineligible for the death penalty pursuant to NRS § 174.098 on the basis of his suffering from Fetal Alcohol Syndrome Disorder (FASD). Counsel moved to strike the State's notice of intent to seek the death penalty on a different basis. The choice between arguments is a tactical decision that is entrusted to counsel and that we will not overturn absent extraordinary circumstances, which Burns has not shown. Further, Burns has not shown prejudice where the district court considered Burns's IQ and adaptive functioning following an evidentiary hearing and concluded that Burns was not intellectually disabled, particularly in light of his normal-range IQ score. *See Ybarra v. State,* 127 Nev. 47, 53-54, 247 P.3d 269, 273 (2011). The district court therefore did not err in denying this claim.

(ECF No. 48-10 at 2-3, 5-6.)

### c.   *De Novo* Review

Burns contends that *de novo* review is appropriate because the Nevada Supreme Court's decision was based on an unreasonable factual determination, namely, there was never an evidentiary hearing held where the state court considered his IQ and adaptive functioning. (ECF No. 72 at 33-34.) The only evidentiary hearing was held during post-conviction proceedings in which Burns's counsel and Burns testified regarding the stipulation made during the trial. (*See* ECF No. 47-22.) Therefore, because the Nevada Supreme Court's decision was based on an unreasonable determination of the facts, this ground will be reviewed de novo. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007)

21

("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires.").

### d.   Analysis

The United States Supreme Court has held that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded person." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (internal quotation marks omitted). *Atkins* left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986)) (alterations in original). Under Nevada state law, "[a] defendant who is charged with murder of the first degree in a case in which the death penalty is sought may . . . file a motion to declare that the defendant is intellectually disabled." NRS § 174.098(1). "Intellectually disabled" is defined under Nevada law as "significant subaverage general intellectual functioning which exists concurrently with deficits in adaptive behavior and manifested during the developmental period." NRS § 174.098(7).

Burns fails to demonstrate deficiency regarding his counsel's lack of movement to strike the notice of death penalty due to his alleged intellectual disability. There does not appear to be any dispute that Burns has been diagnosed with Alcohol-Related Neurodevelopmental Disorder and Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure. And, although it is clear from the reports that Burns suffers from deficits in adaptive behavior,[6] Burns fails to demonstrate that he suffers from significant subaverage general intellectual functioning.

Alcohol-Related Neurodevelopmental Disorder and Neurodevelopmental Disorder Associated with Prenatal Alcohol Exposure are "diagnoses [that] involve Central Nervous

---

[6]Dr. Connor concluded that Burns had "at least mild levels and frequently quite severe levels of impairment in many of the areas that were assessed with respect to day-to-day adaptive functioning." (ECF No. 22-2 at 18.)

System (CNS) damage/abnormality" (ECF No. 22-2 at 117), so these diagnoses do not automatically mean that a person has an intellectual disability. Rather, the Nevada Supreme Court, in "address[ing] the statutory definition of mentally retarded,"[7] stated that "significant limitations in intellectual functioning" within the meaning of NRS § 174.098(7) "has been measured in large part by intelligence (IQ) tests." *Ybarra v. State*, 247 P.3d 269, 273–74 (Nev. 2011). The Nevada Supreme Court then explained that "the clinical definitions indicate that individuals with IQs between 70 and 75 fall into the category of subaverage intellectual functioning." *Id.* at 274 (internal quotation marks omitted). Here, Burns's overall IQ is 93, which is well within the average range. In fact, Burns's "Verbal Comprehension was measured at 98, Perceptual Reasoning was measured at 102, and Processing Speed was measured at 92, all within the average range." (ECF No. 22-2 at 126.) The only assessment measuring "within the low average range" was Burns's Working Memory, which was measured at 80. (*Id.*) This objective information undoubtedly weighs against a finding that Burns was intellectually disabled. The Court acknowledges that Burns suffers from deficits in the following "9 domains of functioning[:] verbal and visuospatial memory, impulsivity, processing speed, motor coordination, suggestibility, executive functioning, and all three domains of adaptive functioning [communication, daily living skills, and socialization]." (ECF No. 22-2 at 19.) However, in looking strictly at his intellectual functioning, Burns was found to have performed within the average range "[o]n the balance of tasks," even showing "a slight strength in non-language-based skills." (*Id.*)

Moreover, Burns's trial counsel testified that Burns had no difficulties understanding them. Given that Burns's trial counsel had sufficient time to observe and interact with Burns, were seasoned attorneys who had represented many clients and were likely able to gauge whether a client passed the threshold of having an intellectual disability, obtained reports showing that Burns's IQ was within the average range, and

---

[7]NRS § 174.098 was amended in 2013 to change "mental retarded" to "intellectually disabled."

understood the importance of needing to have a good faith basis upon which to file a motion, Burns fails to demonstrate that his trial counsel were deficient.

Because Burns has not shown that he meets the definition of "intellectually disabled" as defined under Nevada law or that his trial counsel acted deficiently in not moving to strike the death penalty on this basis, he fails to demonstrate ineffectiveness under *Strickland*. Burns is not entitled to relief for ground 1d.[8]

### 6.    Ground 1e—Failures Regarding NRS § 193.165

In ground 1e, Burns alleges that his counsel failed to ask the trial court to articulate each factor of enhancement under NRS § 193.165 and to address the errors in the Presentence Investigation Report ("PSI") during sentencing. (ECF No. 19 at 18.)

#### a.    Nevada State Law

A state court "shall consider the following" factors "[i]n determining the length of the additional penalty imposed" for the deadly weapon enhancement: "(a) [t]he facts and circumstances of the crime; (b) [t]he criminal history of the person; (c) [t]he impact of the crime on any victim; (d) [a]ny mitigating factors presented by the person; and (e) [a]ny other relevant information." NRS § 193.165(1). And "[t]he court shall state on the record that it has considered the information described in paragraphs (a) to (e)." *Id.* The Nevada Supreme Court has "direct[ed] the district courts to make findings regarding each factor enumerated in NRS § 193.165(1) . . . when imposing a sentence for a deadly weapon enhancement." *Mendoza-Lobos v. State*, 218 P.3d 501, 506 (Nev. 2009).

#### b.    State Court Determination

The Nevada Supreme Court denied this claim as follows:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors.

---

[8]For the reasons discussed later in this Order, the Court grants a Certificate of Appealability for this ground.

*Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

. . . .

Burns next argues that counsel should have challenged the sentencing court's failure to make specific findings regarding the deadly weapon enhancements. Burns has not shown prejudice. The record shows that the sentencing court did not state that it had considered the NRS § 193.165(1) factors in sentencing Burns for the deadly weapon enhancements to three of his offenses. *See Mendoza-Lobos v. State,* 125 Nev. 634, 643, 218 P.3d 501, 507 (2009). Notwithstanding the sentencing court's failure to make findings regarding the deadly weapon enhancements, the parties discussed the information relevant to those factors during the sentencing hearing, and the record adequately supports the sentence imposed. *See* NRS § 193.165(1). We therefore conclude that Burns has not shown a reasonable probability of a different outcome had counsel challenged the sentencing court's failure to make findings regarding the factors supporting the sentence enhancement. *See Mendoza-Lobos,* 125 Nev. at 644, 218 P.3d at 507 (holding that it was not plain error where the district court's failure to make findings regarding the sentencing enhancement did not affect the sentencing decision). The district court therefore did not err in denying this claim.

Burns next argues that counsel should have insisted that the district court address several errors in his presentence investigation report. Burns acknowledges that counsel raised these errors in his sentencing memorandum. Burns' argument that counsel should have argued this issue more strenuously does not show deficient performance, as counsel's tactical decisions are virtually unchallengeable absent a showing of extraordinary circumstances, which Burns has not made, particularly as the errors were minor. The district court therefore did not err in denying this claim.

(ECF No. 48-10 at 2-3, 6-7.)

### c.    Analysis

Burns is correct that the trial court did not strictly abide by the requirements of NRS § 193.165(1) by discussing each factor. (*See generally* ECF No. 46-10.) Thus, it would have been prudent for Burns's counsel to have objected. However, as the Nevada

25

1    Supreme Court reasonably concluded, Burns fails to demonstrate prejudice. Burns's

2    contention that there is a reasonable probability that the trial court would have imposed a

3    more favorable sentence had his counsel objected to the trial court's error is mere

4    conjecture. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is

5    not established by mere speculation."). Indeed, Burns fails to demonstrate that the trial

6    court's failure to formulaically discuss these factors had any bearing on his sentence,

7    especially given that he had stipulated to a sentence of life without the possibility of parole.

8    *See Mendoza-Lobos*, 218 P.3d at 508 (finding that even though "the district court failed

9    to articulate findings regarding each of the enumerated factors for each deadly weapon

10   enhancement[,] . . . nothing in the record indicates that the district court's failure to make

11   certain findings on the record had any bearing on the district court's sentencing decision,"

12   so "the district court's omission did not cause any prejudice or a miscarriage of justice").

13        Turning to Burns's second contention, in his PSI, under Mental Health History, the

14   following information was given: "The defendant related that his attorney had him

15   evaluated and there is a consensus that he may have fetal alcohol syndrome; however,

16   he has not been formally diagnosed with this condition." (ECF No. 22-1 at 5.) Later in the

17   PSI, under Offense Synopsis, the following information was given: "On August 8, 2010,

18   detectives obtained a statement from [D.N.] at UMC. She . . . identified [the shooter] as

19   David Burns." (*Id.* at 7.) Burns contends that these statements are factually incorrect and

20   should have been corrected by his counsel at the sentencing hearing. The Nevada

21   Supreme Court reasonably determined that Burns fails to demonstrate deficiency. Burns

22   provides no support for this contention that bringing this information to the trial court's

23   attention was required to have been made in a specific way. *See Richter*, 562 U.S. at 106

24   ("Rare are the situations in which the wide latitude counsel must have in making tactical

25   decisions will be limited to any one technique or approach."); *Strickland*, 466 U.S. at 688-

26   89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take

27

28                                              26

account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). And, here, Burns's counsel reasonably highlighted and corrected these two factual errors in a sentencing memorandum[9] explaining that (1) "Mr. Burns was, in fact, diagnosed with fetal alcohol syndrome by a team of specialists in the field of FAS," and (2) D.N. only "gave a general description of her assailant when interviewed on August 8, 2010." (ECF No. 22-2 at 4.)

In sum, because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland* and was not based on an unreasonable determination of the facts, Burns is not entitled to federal habeas relief on ground 1e.

### 7.    Ground 1f—Failures Regarding Expert Witnesses

In ground 1f, Burns alleges his counsel failed to move to exclude improperly noticed cellular phone expert witness testimony. (ECF No. 19 at 21.)

///

### a.    State Court Determination

The Nevada Supreme Court denied this claim as follows:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and resulting prejudice in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984); *Warden v. Lyons,*100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland).* Both components of the inquiry must be shown, *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State,* 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden,* 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

---

[9]During the sentencing hearing, the trial court indicated that it "had a chance to read the memorandum." (ECF No. 46-10 at 4.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Burns first argues that counsel should have moved to exclude expert testimony from cellular company record custodians who were not noticed as experts. The record shows that the witnesses were noticed as experts on cellular phone and tower operation, the subjects of their testimony. *See Burnside v. State,* 131 Nev. 371, 384, 352 P.3d 627, 637 (2015) (presupposing that a cellular company record custodian may provide expert testimony when properly noticed as an expert). As a challenge to the witnesses' testimony on this basis would have been futile, counsel was not deficient in omitting it. *See Ennis v. State,* 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006). The district court therefore did not err in denying this claim.

(ECF No. 48-10 at 2-3.)

### b.      Analysis

The prosecution filed a Notice of Expert Witnesses, which included the following: (1) "CUSTODIAN OF RECORDS METRO PCS, or Designee, will testify as an expert regarding how cellular phones work, how phones interact with towers, and the interpretation of that information," and (2) "CUSTODIAN OF RECORDS T-MOBILE, or Designee, will testify as an expert regarding how cellular phones work, how phones interact with towers, and the interpretation of that information." (ECF No. 38-49 at 3.) Burns contends that, although the prosecution filed this notice, there was no evidence to suggest these alleged experts were qualified, explaining that the prosecution never asked about academic degrees or licenses, specialized training, or other relevant questions necessary to qualify someone as an expert. (ECF No. 72 at 39.) Because this argument is belied by the record, the Nevada Supreme Court reasonably determined that Burns's counsel was not deficient regarding the cell phone experts.

Although the prosecution's inquiry was cursory, it did briefly probe these experts about their specialized knowledge regarding cell phones. Kenneth LeCesne, "a custodian of records for Metro PCS cellular telephone company," testified he had "an understanding [of] . . . how Metro PCS cell phones work and how the records are generated." (ECF No. 45-9 at 18-19.) And Raymond MacDonald, a senior manager for T-Mobile, testified that "[b]ased upon [his] . . . job and [his] training and experience," he had "an underlying

28

knowledge of essentially how the T-Mobile cell phone technology works and what information gets . . . to various records of T-Mobile." (ECF No. 30-31.) These testimonies—regardless of the lack of depth or breadth—show that LeCesne and MacDonald had specialized knowledge about cell phones. *See* NRS § 50.275 ("If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testified to matters within the scope of such knowledge."). Accordingly, because the Nevada Supreme Court's determination constituted an objectively reasonable application of *Strickland*'s performance prong and was not based on an unreasonable determination of the facts, Burns is not entitled to federal habeas relief on ground 1f.

### B.    Grounds 2, 4, and 6

In ground 2, Burns alleges the trial court erred by denying a pretrial motion to suppress D.N.'s identification of him and subsequent admission of that evidence during trial. (ECF No. 19 at 22.) In ground 4, Burns alleges the trial court's submission of video recordings outside the evidence to the jury violated his right to due process and a fair trial. (*Id.* at 28.) And, in ground 6, Burns alleges the trial court's imposition of a sentence of life without the possibility of parole violated his right to due process and to be free from cruel and unusual punishment. (*Id.* at 37.)

Burns previously conceded that these grounds were procedurally defaulted, but he argued he could demonstrate good cause and prejudice to overcome the procedural defaults because (1) his counsel was ineffective in advising him to agree to the stipulation that barred him from raising these claims on direct appeal; and (2) these grounds are meritorious. (ECF No. 49 at 3-4.) Specifically, Burns argued that ground 1d establishes cause to overcome the procedural default. (*Id.* at 4-6.) The Court deferred ruling on this procedural default issue until after considering whether Burns's counsel was ineffective

in ground 1d. (ECF No. 53 at 6.) Given that the Court has found Burns's counsel was not deficient in ground 1d, *supra*, Burns fails to demonstrate good cause to overcome these procedurally defaulted grounds. Grounds 2, 4, and 6 are dismissed.

### C.    Ground 3—Trial Court Errors Regarding Prosecutorial Misconduct

In ground 3, Burns alleges the trial court erred by overruling or failing to grant relief on objections to prosecutorial misconduct during closing arguments in violation of his right to due process and a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 19 at 25.)

### 1.    Background

During surrebuttal argument, the prosecutor made the following argument, prompting an objection from the defense:

| | |
|---|---|
| [Prosecutor]: | What happens in courthouses across America and what be happening in this courtroom by a jury of 12 people is that it's a search for a truth. And before about 20 minutes ago, that would seem to be what we were all doing here for the last four weeks. |
| [Defense]: | Judge, I object to that. That's disparaging counsel. |
| [Prosecutor]: | He just accused me - - |
| [Defense]: | To - - to - - |
| [Prosecutor]: | - - of lying and deceiving the jury. |
| THE COURT: | Please. Objection's overruled. |
| [Prosecutor]: | Thank you. |
| THE COURT: | Sit down. Let's go. |
| [Prosecutor]: | The past 20 minutes [defense counsel] got up here as opposed to two sides arguing an issue and suggested that the players themselves somehow are manipulating what happens with the 12 people to search for that truth. Certainly a jury system, that's all this is, 12 jurors decide what the truth is and then decide whether or not [the prosecution] can establish beyond a reasonable doubt that these two individuals committed the crimes that they are accused of. |

(ECF No. 46-5 at 52.) A short time later, the prosecutor made another argument that resulted in an objection from the defense:

| | |
|---|---|
| [Prosecutor]: | Baby Job-Loc. Once again, the suggestion that he's associated with Baby Job-Loc, how is that relevant? Is there any evidence whatsoever that Baby Job-Loc could possibly even be the shooter in this case? He |

|   |   |   |
|---|---|---|
| 1 | | doesn't match the physical description in the least bit, he's not on any video, his cell phone records don't seem to be connecting with - - with Job-Loc at the time that the crime [was] committed. There's no connection whatsoever to him other than Ulonda Cooper. Oh wait, we didn't hear from Ulonda Cooper. She's not a witness in this case. Did you assess Ulonda Cooper's credibility? |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | [Defense]: | Objection. Burden shifting. That's burden shifting. We didn't hear from Ulonda Cooper is implying that we have a duty to call a witness. So I object. |
| 6 | THE COURT: | You don't have a duty to call witnesses. |
| 7 | [Prosecutor]: | They don't have a duty. But they certainly want them to rely on Ulonda Cooper's statement that's relayed by Detective Bunting - - |
| 8 | THE COURT: | All right. |
| 9 | [Prosecutor]: | - - in a police report. |
|   | THE COURT: | Objection - - go ahead. |
| 10 | [Prosecutor]: | Thank you. How do you assess that woman's credibility? How do you know if she was telling the truth or not telling the truth? She got parts of it right, she got parts of it wrong. |
| 11 | | |

(*Id.* at 75-76.) Finally, towards the conclusion of the prosecution's rebuttal argument,

Burns's counsel objected to the prosecution's PowerPoint presentation:

|   |   |   |
|---|---|---|
| 14 | [Defense]: | The Supreme Court has said that you cannot do what he has just done. In fact, that's why I didn't call it a circle of guilt. |
| 15 | | Put it back up there . . . so the judge can see it. |
| 16 | | He's called it a circle of guilt. The Supreme Court just reversed a case for saying "guilt" like that over the defendant. That's why I specifically called it circle of coincidences, because I didn't think I could do that. So I object to that and ask that . . . he remove it. |
| 17 | | |
| 18 | | |
| 19 | [Prosecutor]: | That was in opening. The Court said it was argumentative and it shouldn't have been done. This is now closing. I certainly can say that he's guilty and this is a circle of guilt. |
| 20 | | |
| 21 | . . . | |
|   | [Defense]: | . . . But the Supreme Court overturned a case in the last - - in the last few months saying that the prosecutor - - |
| 22 | | |
| 23 | THE COURT: | I'm not familiar with the case. |
|   | [Prosecutor]: | And that was in opening. |
| 24 | THE COURT: | In opening? |
|   | [Prosecutor]: | Not in closing. This is argument. |
|   | THE COURT: | Okay. . . . All right. Let's go. |
| 25 | | |

(*Id.* at 88-89.)

### 2.    State Court Determination

In affirming Burns's judgment of conviction, the Nevada Supreme Court held:

> Burns claims that the State engaged in multiple instances of prosecutorial misconduct during its closing argument. In reviewing such claims, this court determines whether the prosecutor's conduct was improper and, if so, whether the conduct warrants reversal. *Valdez v. State,* 124 Nev. 1172, 1188, 196 P.3d 465,476 (2008). If the error is preserved and of a constitutional dimension—that is, if it involves impermissible comment on a constitutional right or has "so infected the trial with unfairness as to make the resulting conviction a denial of due process"—this court "will reverse unless the State demonstrates, beyond a reasonable doubt, that the error did not contribute to the verdict." *Id.* at 1189, 196 P.3d at 476-77 (internal quotation marks omitted). If the misconduct is not of a constitutional dimension, this court "will reverse only if the error substantially affects the jury's verdict." *Id.* at 1189, 196 P.3d at 476.
>
> *Referring to defense counsel*
> The State opened its rebuttal argument with the following comment: "What happens in courthouses across America and what should be happening in this courtroom by a jury of 12 people is that it's a search for a truth. And before about 20 minutes ago, that would seem to be what we were all doing here for the last four weeks." But "20 minutes ago," the State was plainly referring to the defense's closing argument, thus implying that the defense was not engaged in "a search for a truth." Burns objected, saying "[t]hat's disparaging counsel," but the court overruled the objection. Burn alleges on appeal that this was reversible prosecutorial misconduct of a constitutional dimension.
>
> This court has found that "'[d]isparaging remarks directed toward defense counsel 'have absolutely no place in a courtroom, and clearly constitute misconduct.'" *Butler v. State,* 120 Nev. 879, 898, 102 P.3d 71, 84 (2004) (quoting *McGuire v. State,* 100 Nev. 153, 158, 677 P.2d 1060, 1064 (1984)). We have found such misconduct in quips made solely "to belittle defense counsel," *McGuire,* 100 Nev. at 158, 677 P.2d at 1064; when a prosecutor commented that defense counsel resorted to "smoke screens and flat-out deception," *Rose v. State,* 123 Nev. 194, 210, 163 P.3d 408, 419 (2007); and when a prosecutor made lengthy comments that defense counsel was trying to distract the jurors and to "market" them a "product," *Butler,* 120 Nev. at 897-98, 102 P.3d at 84. In contrast, the comment at issue here was not directed at opposing counsel with the purpose to belittle them; instead, it was focused particularly on the truth of the defense's version of events. Therefore, we conclude that the prosecutor's comments did not amount to misconduct.
>
> *Referring to a non-testifying witness*
> During his trial testimony, a detective referred to a statement made to him by a woman, Ulonda Cooper, who did not testify at trial. Defense counsel mentioned Cooper during his closing argument: "According to

Detective Bunting, . . . that's what Ulanda [sic] Cooper told me; I never got her taped statement; that's what she told me and I just put it in there. Okay .... And you know what the most ironic thing about this, Ulonda Cooper was right." In rebuttal, the State said, "There's no connection whatsoever to him [another suspect] other than Ulonda Cooper. Oh, wait, we didn't hear from Ulonda Cooper. She's not a witness in this case. Did you assess Ulonda Cooper's credibility?" The defense objected and was overruled.

This court has held "it is generally improper for a prosecutor to comment on the defense's failure to produce evidence or call witnesses as such comment impermissibly shifts the burden of proof to the defense." *Whitney v. State,* 112 Nev. 499, 500, 502, 915 P.2d 881, 882, 883 (1996) (reversing a conviction after prosecutor "repeatedly call[ed] attention to the defense's lack of witnesses"). But when the comment goes to the defense's theory of what happened, it is permissible. For example, in *Rimer v. State,* we concluded that misconduct did not occur when the prosecutor pointed out that the defense failed to substantiate its theory that the defendants were sick and unable to commit the alleged crime. 131 Nev. 307, 331, 351 P.3d 697, 714 (2015). The comment at issue here is similar to that in *Rimer*. Burns' defense was, in part, that a coconspirator was the shooter. Burns' reference to Ulonda Cooper during his closing argument went to that theory. In these circumstances, the prosecution's response was a permissible comment on the evidence at hand and whether it substantiated the defense theory, not impermissible shifting of the burden of proof. Therefore, we conclude that there was no prosecutorial misconduct as to the Ulonda Cooper comments.

*PowerPoint display*

The State used a PowerPoint presentation during its rebuttal closing argument. One slide contained an illustration purporting to set out facts that disprove any notion of coincidence, which both the State and Burns describe on appeal as "a circle of guilt." Defense counsel objected and was overruled.

This court has held that it was reversible error for the prosecutor, during opening statements, to display a defendant's booking photo overlaid with the word "GUILTY," while simultaneously urging the jurors orally to find the defendant guilty. *Watters v. State,* 129 Nev. 886, 891, 313 P.3d 243, 247-48 (2013). This court found that while the oral statement was permissible, the visual slide was not because it "directly declared Watters guilty." *Id.* at 891, 313 P.3d at 248. In doing so, we noted that making the improper argument visually (declaring a defendant guilty in an opening statement photo) was even more prejudicial than it would have been had it been made orally. *Id.* at 892, 313 P.3d at 248.

Here, the district court overruled the objection on the ground that the PowerPoint slide was used in closing argument, whereas the slide in *Watters* was used in an opening statement. We agree. *Watters* is limited to opening statements, where a prosecutor may not directly declare the defendant guilty. *See Artiga-Morales v. State,* 130 Nev. 795, 799, 335 P.3d

179, 182 (2014) (holding that the use of the defendant's photograph with the word "guilty" across the front was not error, in part because it was shown during closing arguments). And even if the district court erred, the slide alleging "a circle of guilt" did not make the proceedings so unfair as to be error of a constitutional dimension or substantially affect the verdict.

(ECF No. 48-34 at 14-17.)

### 3.    Standard

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, the Court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

### 4.    Analysis

First, the Nevada Supreme Court reasonably concluded that the prosecution did not commit misconduct by allegedly disparaging the defense. The prosecution is allowed to criticize defense theories during closing argument. *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."). And, here, the Nevada Supreme Court reasonably found

34

that the prosecution was not belittling defense counsel directly; rather, it was criticizing the defense's closing argument. During the defense's closing argument, in an attempt to cast blame on Thomas for the murder, Burns's counsel argued that it was "unforgivable" that the police lied about Thomas's cellphone records on "the behest of a prosecuting agency." (ECF No. 46-5 at 39.) The prosecution's instant statement in return that the case had been about searching for the truth until "about 20 minutes ago" was merely a comment on this defensive closing theory, which scolded the prosecution rather than attempt to persuade the jury that the prosecution had not proven Burns's guilt beyond a reasonable doubt.

Second, the Nevada Supreme Court reasonably concluded that the prosecution did not commit misconduct regarding the Ulonda Cooper comments. The State is prohibited from using burden-shifting that relieves it of its burden of proving every element beyond a reasonable doubt. *See Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979). However, as the Nevada Supreme Court reasonably concluded, the prosecution's comments about Cooper did not amount to burden-shifting. During the defense's closing statement, it discussed Cooper's statement to Detective Bunting regarding the movement and location of the gun after the shooting, which did not involve Burns, to shift blame away from him. (ECF No. 46-5 at 34-35.) As such, and as the Nevada Supreme Court reasonably found, the prosecution's statement that Cooper did not testify, meaning her credibility was untested in this regard, was a permissible comment on the evidence at hand rather than an attempt to transfer responsibility to the defense. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel.").

Third, the Nevada Supreme Court, the final arbiter of Nevada law, found the prosecution's use of the words "Circle of Guilt" in its PowerPoint presentation did not

violate Nevada law. *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (explaining that "[s]imple errors of state law do not warrant federal habeas relief"). And Burns fails to articulate how the prosecution's PowerPoint lacked congruence with federal law. Rather, "[a] prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory." *Menendez v. Terhune*, 422 F.3d 1012, 1034 (9th Cir. 2005). Accordingly, Burns fails to demonstrate that the prosecution's use of the phrase "Circle of Guilt" during closing argument violated due process or rendered his trial unfair.

Because the Nevada Supreme Court's determination constituted an objectively reasonable application of federal law and was not based on an unreasonable determination of the facts, Burns is not entitled to federal habeas relief on ground 3.

## D.    Ground 5—*Batson*

In ground 5, Burns alleges that the trial court violated the Equal Protection Clause of the United States Constitution by denying challenges to discriminatory practices prohibited by *Batson v. Kentucky*, 476 U.S. 79 (1986). (ECF No. 19 at 31.)

### 1.    Background

Juror No. 91, Mr. Marwah Bhupesh, stated he was from India and was "black or halfway there." (ECF No. 41-21 at 13-14, 45.) In his pretrial questionnaire, Mr. Bhupesh stated that he did not believe in the death penalty because "death is too easy, they should be forced to sit in custody for the rest of their life and think about it." (*Id.* at 31.) The following colloquy then took place:

| | |
|---|---|
| [Prosecutor]: | Okay. Would you agree with me that somebody who is in jail being forced to think about it, that that person, by definition, has to have a conscience; right? |
| [Mr. Bhupesh]: | Usually. Well, if they don't have it, it comes to them. |
| [Prosecutor]: | Do you think – |
| [Mr. Bhupesh]: | That's my belief, that it will come to them. |
| [Prosecutor]: | And that's my question. Do you think that everybody who winds up in prison for life without for a crime that they've committed would actually think about that crime as opposed to -- you know, the average everyday |

|  | person, absolutely. We're going to sit there and think, oh my God, why did I do this? Do you think that applies to everybody? |
| [Mr. Bhupesh]: | I would assume it would because I also know that all - - not all crimes are committed in -- in sane mind. But they don't have access to all those drugs and all those other things in the prison, so sanity comes to them because they don't have access to the other drugs which will make them insane or - - |
| . . . |  |
| [Prosecutor]: | In your kind of frame of mind everybody has kind of the capacity to have a conscience. |
| [Mr. Bhupesh]: | Yeah. |

(*Id.* at 32-33.) Following further probing, Mr. Bhupesh explained that, while he does not believe in the death penalty, "in certain cases [he] might be willing to impose it." (*Id.* at 34.) Mr. Bhupesh clarified this answer as follows:

> It depends on case to case, individual to individual. In my opinion, if somebody has -- has been a criminal, has been through the justice system, has been in prison, comes out, does it again, and comes out and does it again, and there is nothing -- no contribution from that individual to the society and it keeps the -- the kind of acts get gruesome and gruesome, then at -- at one point I would agree to that -- that certain individual if it comes back into the justice system and death penalty is one of the options, then that is at that time fair. But, again, if it's just a first stage and if you ask a grown adult what is two plus two and he says seven, you know, you look at that guy funny compared to a kid and you coach the kid. That's my opinion.

(*Id.* at 35.) Finally, Mr. Bhupesh answered, "[n]o hesitation," when asked if, "[a]t the end of the day, if you and eleven of your fellow jurors all felt that it was appropriate that Mr. Burns receive the ultimate punishment, any hesitation in your mind that you'd be willing to vote for it?" (*Id.* at 37.) The prosecution passed Mr. Bhupesh for cause. (*Id.* at 38.)

Two days later, the trial court instructed the parties to select their peremptory challenges. (ECF No. 44-4 at 316.) The prosecution exercised its third peremptory challenge on Mr. Bhupesh. (*Id.* at 318.) The following discussion took place:

| [Defense counsel]: | Your Honor, we need to make a record on that. We need a race-neutral reason on that. He characterized himself as black. The Court told us at the bench you took judicial notice that he was black. |
| THE COURT: | I would agree that a Batson challenge could be made as to Mr. Marwah. |
| [Prosecutor]: | Is that all the record they want to make? |

37

| | | |
|---|---|---|
| 1 | [Defense counsel]: | Well, I don't know what – |
| | THE COURT: | It's up to - - it's actually your burden to show a [race]-neutral reason - - |
| 2 | [Defense counsel]: | Right. |
| | THE COURT: | for excusing a juror that's black. |
| 3 | [Prosecutor]: | And I apologize because we've been litigating this a lot in front of the Nevada Supreme Court. The very first thing that the defense needs to do is they need to establish a prima facie case of racial discrimination, which I would note on this jury there are -- we have 10 perempts out of 28 people -- or we have eight perempts out of 28 people, and there is a significant number of African Americans. There's no way on earth that these individuals - - that they can establish prong one of this -- of this procedure, particularly for the first juror. |
| 8 | | And I would note that I know that [defense counsel] said it at the bench. Maybe it was day one before there was a recording. [Defense counsel] says, Well, I think what he was saying is that he was Indian, and that gave him a skin color that made him think he was black. Mr. -- and I recognize the Court said that from your perspective you were going to find him black, but certainly using this perempt against this juror does not establish step one which is a prima facie case that we are engaged in racial discrimination. |
| 13 | | The record can speak for itself on what his basis is, but if you don't find we get past step one, then there is no basis to require a race-neutral reason in step two, and I would submit that we have been very lax in this jurisdiction on step one. |
| 16 | THE COURT: | I haven't looked at those decisions in while, I confess to you. |
| 17 | [Defense counsel]: | Judge, there has been some decisions, and I'd like to bring up to the Court's attention that causes me concern. I had an oral argument with - - against [the prosecutor] where he was the trial attorney. [Defense counsel] and I were defense counsel. It was an all white jury, a black defendant accused of murdering two non-African-American women, and the Supreme Court Justice Cherry stated off by saying, Do you want to spend your career defending against peremptory challenges on blacks? |
| 22 | | And then there's been another case just recently where the Supreme Court overturned a capital murder conviction because the State was striking blacks, all the blacks, and when I see this, I'm, like, What did that man say that would cause him not to be a fair juror? And so now we are starting to eliminate all of these, and it causes me concern that what's going on happen here is we're going to be left with an underrepresentation of minorities, specifically African Americans, and so we would ask that he not be removed. |

38

| [Prosecutor]: | Judge, just for the record, there are three more African-American jurors on a panel of 28, which means - - |
| THE COURT: | Four more. |
| [Prosecutor]: | Oh, sorry. Four more on a panel of 28. So there's five total jurors out of 28. Is the suggestion we use our first perempt, five out of 28, which is more than 20 percent - - |
| THE COURT: | I must tell you, of all the five jurors that are on this panel, this first one was the one that if I was State's counsel I'd be more inclined to excuse than the other four because of his answers to the death penalty questions. Now, I don't know what your grounds are for doing it. . . . Let's assume that they have met their burden and that you have to show me that there's a race-neutral reason. |
| [Prosecutor]: | Yes. And, Judge, what I would ask is that the Court make a finding that they haven't met their burden but then ask me out of an abundance of caution to do so. |
| THE COURT: | I don't think they've met their burden, but in an abundance of caution, would you tell me what race neutral reasons there are for excusing this particular juror? |
| [Prosecutor]: | Yes, Judge. It's related to his answers in penalty, both on my direct questioning of him but on the defense. He specifically says - - when I asked about whether or not he could ever impose the death penalty - - I could do my best. Death is too easy. Their conscience would come to them. Not all crime's committed in the same mind. Everyone has a conscience. I don't believe in the death penalty. You should be able to coach a kid in the opportunity for rehabilitation and for failure to take advantage of that. It is a prove - - even if it was proven that he's the one who did it. |
|  | We have a 18-year old defendant. We have a man who says, For children, I believe in rehabilitation. I don't believe in the death penalty, and that is the situation, what I would find very difficult to impose it. |
|  | And for that, that's clearly a race-neutral reason. |
| THE COURT: | I've looked at this, and I saw where in answer to Question No. 24 which says: Do you believe in the death penalty? He had checked no, and then he had checked down below, Although I could not vote to impose the death penalty, I could vote to impose a sentence of life imprisonment without any possibility of parole in the proper circumstances. |
|  | I think that he -- I think there's good reason-neutral reasons for excusing him. I'm going to deny the Batson challenges to Juror No. 1 or No. 91. So the State has exercised its third peremptory challenge as to Badge No. 91. |

(*Id.* at 318-22.)

39

**2.      State Court Determination**

In affirming Burns's judgment of conviction, the Nevada Supreme Court held:

> Burns alleges that the district court improperly denied his challenge to the State's peremptory removal of a prospective juror. An allegation that a peremptory challenge was used with racially discriminatory intent is governed by the three-step analysis adopted by the United States Supreme Court in *Batson v. Kentucky,* 476 U.S. 79 (1986).
>
>> Under [that] jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.
>
> *Purkett v. Elem,* 514 U.S. 765, 767 (1995).
>
> We review the district court's ruling on a *Batson* challenge for an abuse of discretion. *Nunnery v. State,* 127 Nev. 749, 783, 263 P.3d 235, 258 (2011). Further, with respect to step three, "[t]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Walker v. State,* 113 Nev. 853, 867-68, 944 P.2d 762, 771-72 (1997) (quoting *Hernandez v. New York,* 500 U.S. 352, 364 (1991)).
>
> Burns objected to the State's use of a peremptory challenge to remove Juror 91. The juror did not identify his race, but he stated that he had emigrated from India. The district court took judicial notice that Juror 91 was a member of a cognizable group. The State alleges that Burns did nothing "more than point out that a member of a cognizable group was struck," which is insufficient to meet his burden at step one of the *Batson* analysis. *Williams v. State,* 134 Nev. 687, 690, 429 P.3d 301, 306 (2018). The district court indicated its agreement with the State, saying, "I don't think they've met their burden . . . ." But then, "in an abundance of caution," the court asked the State to "tell [the court] what race neutral reasons there are for excusing this particular juror?" We have noted that, when "the district court asked the State to provide its explanation for the peremptory challenge solely out of an abundance of caution after the court had determined that [the defendant] failed to make a prima facie case, the first step of the *Batson* analysis was not rendered moot." *Watson v. State,* 130 Nev. 764, 780, 335 P.3d 157, 169 (2014). As a result, we may examine whether Burns made a prima facie case of racial discrimination. We agree with the district court that he did not. Counsel offered no explanation besides anecdotes from other cases counsel had argued and references to other matters before this court. Burns' only point related to this specific juror was that the court had taken judicial notice that the juror was "Black." Burns

40

did not meet the step one standard of a prima facie showing of discrimination.

Even if Burns *had* made such a showing, the State did give a race-neutral rationale based primarily on the juror's answers in a questionnaire regarding the death penalty. According to the district court, in the questionnaire, the juror had said, "Although I could not vote to impose the death penalty, I could vote to impose a sentence of life imprisonment without any possibility of parole in the proper circumstances." While the juror walked back this questionnaire answer on direct questioning, the district court found that the juror's answers to the death penalty questions were sufficient justifications so that there had not been a showing of purposeful racial discrimination under step three of the *Batson* analysis.

We conclude the district court did not abuse its discretion in overruling the *Batson* challenge to Juror 91. It does not appear that Burns met his burden under step one, and even if he had, the race-neutral explanation and the decision by the district court were sufficient, so we find no error in steps two or three.

(ECF No. 48-34 at 12-14.)

### 3.    Standard

The use of a peremptory challenge to remove a prospective juror because of race violates the federal constitution. *See J.E.B. v. Alabama ex. rel. T.B.*, 511 U.S. 127, 129 (1994); *see also Powers v. Ohio*, 499 U.S. 400, 409 (1991). Under *Batson v. Kentucky* and its progeny, consideration of a defendant's challenge to a peremptory strike involves a three-step analysis: (1) "the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race," (2) "if the showing is made, the burden shifts to the prosecution to present a race-neutral explanation for striking the juror in question," and (3) "the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Rice v. Collins*, 546 U.S. 333, 338 (2006). Defendants may present the following factors to establish step one: (1) "statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case," (2) "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case," (3) "side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in

41

1   the case," (4) "a prosecutor's misrepresentations of the record when defending the strikes

2   during the Batson hearing," (5) "relevant history of the State's peremptory strikes in past

3   cases," or (6) "other relevant circumstances that bear upon the issue of racial

4   discrimination." *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). "[T]he critical question

5   in determining whether a [petitioner] has proved purposeful discrimination at step three is

6   the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v.*

7   *Cockrell*, 537 U.S. 322, 338-39 (2003). This issue comes down to credibility, and

8   "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by

9   how reasonable, or how improbable, the explanations are; and by whether the proffered

10  rationale has some basis in accepted trial strategy." *See id.* at 339.

11          **4.    Analysis**

12          Even if Burns made a prima facie showing of racial discrimination, the Nevada

13  Supreme Court reasonably determined that the prosecution gave a race-neutral rationale

14  for using a peremptory challenge on Mr. Bhupesh. Burns argues that the prosecution's

15  race-neutral explanation was pretextual. (ECF No. 19 at 36-37.) This argument is belied

16  by the record.

17          Mr. Bhupesh stated in his pretrial questionnaire that he did not believe in the death

18  penalty. As the Nevada Supreme Court reasonably noted, Mr. Bhupesh walked back this

19  answer while being questioned by the prosecution, stating that he "might be willing to

20  impose it" in "certain cases." However, Mr. Bhupesh made it clear that "a kid" or a first-

21  time offender should have a chance at rehabilitation. This viewpoint conflicted with the

22  prosecution's, negating any pretextual contention. The prosecution was seeking a death

23  sentence for Burns, who fell squarely within Mr. Bhupesh's category of offenders who

24  received a chance at rehabilitation, given that Burns was just 18 years old at the time of

25  the murder and had only a minor criminal record. It was reasonable under these

26  circumstances for the prosecution to not have wanted Mr. Bhupesh to sit on the jury.

27

28                                              42

Consequently, because the Nevada Supreme Court's determination denying Burns relief constituted an objectively reasonable application of *Batson* and was not based on an unreasonable determination of the facts, Burns is not entitled to federal habeas relief for ground 5.

### E.    Ground 7—Cumulative Error

In ground 7, Burns alleges the cumulative errors prejudiced him in violation of his due process right to a fair trial as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (ECF No. 19 at 41.) The Court previously dismissed this ground to the extent it relied on direct appeal claims. (ECF No. 60.)

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

The Nevada Supreme Court denied this claim as follows:

> Burns next argues that cumulative error warrants relief. Even assuming that multiple deficiencies may be cumulated in a postconviction context, *see McConnell v. State*, 125 Nev. 243, 259, 212 P.3d 307, 318 (2009), Burns has only demonstrated a single instance of arguably deficient performance considering counsel's failure to request specific findings pursuant to NRS § 193.165(1), for which relief is not warranted, and a single instance of deficiency cannot cumulate, *see United States v. Sager*, 227 F.3d 1138, 1149 (9th Cir. 2000).

(ECF No. 48-10 at 7-8.)

The Nevada Supreme Court reasonably determined that Burns failed to demonstrate multiple counsel errors, so he is not entitled to relief for ground 7.

### V.    MOTION FOR EVIDENTIARY HEARING

43

In his Motion, Burns requests that the Court hold an evidentiary hearing on grounds 1a and 1d, explaining that the state court refused to hold an evidentiary hearing, which prevented him from developing the record on these ineffective-assistance-of-trial-counsel claims. (ECF No. 74.)

U.S.C. § 2254(e)(2) provides as follows:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A)    the claim relies on--
>    (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>    (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

In *Shinn v. Ramirez*, the Supreme Court of the United States reinforced that, when reviewing a federal habeas petition, the federal court may not consider any facts beyond the factual record presented to the state post-conviction relief court unless one of the exceptions of 28 U.S.C. § 2254(e)(2) applies. *See* 596 U.S. at 382.

Regarding ground 1a, the Court has already determined that de novo review is unwarranted, so holding an evidentiary hearing to supplement the record is futile. *See Pinholster*, 563 U.S. at 181 (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). And, regarding ground 1d, Burns explains that he would call his counsel as witnesses and inquire why they failed to move to strike the death penalty based on the expert reports of his intellectual disability. (ECF No. 74 at 5-6.) The Court has already determined that Burns is not entitled to relief on ground 1d because his expert reports fail to show that he meets the definition of "intellectually disabled" as defined under Nevada state law. Thus, further

1  factual development regarding Burns's counsel's reasoning in not moving to strike the

2  notice of death penalty on this basis would not affect the Court's reasons for denying

3  relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise

4  precludes habeas relief, a district court is not required to hold an evidentiary hearing.").

5  Accordingly, the Motion is denied.

6  **VI.   CERTIFICATE OF APPEALABILITY**

7      This is a final order adverse to Burns. Rule 11 of the Rules Governing Section

8  2254 Cases requires the Court to issue or deny a Certificate of Appealability. The Court

9  has *sua sponte* evaluated the claims within the First Amended Petition for suitability for

10  the issuance of a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *see also Turner*

11  *v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under 28 U.S.C. § 2253(c)(2), a

12  Certificate of Appealability may issue only when the petitioner "has made a substantial

13  showing of the denial of a constitutional right." With respect to claims rejected on the

14  merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

15  assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

16  473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For

17  procedural rulings, a Certificate of Appealability is appropriate only if reasonable jurists

18  could debate (1) whether the petition states a valid claim of the denial of a constitutional

19  right and (2) whether the Court's procedural ruling was correct. *See id.*

20      Applying these standards, the Court finds that a Certificate of Appealability is

21  warranted for ground 1d. Reasonable jurists could dispute whether Burns has shown that

22  he meets the definition of "intellectually disabled" as defined under Nevada state law.

23  Although Burns's IQ was average, "[o]ther evidence may be used to demonstrate

24  subaverage intellectual functioning." *Ybarra*, 247 F.3d at 274. Here, experts reported that

25  Burns's Alcohol-Related Neurodevelopmental Disorder and Neurodevelopmental

26  Disorder Associated with Prenatal Alcohol Exposure presented in a similar fashion to an

27

28

intellectual disability. First, Dr. Adler reported that "[p]ersons with FASDs [Fetal Alcohol Spectrum Disorder] typically have IQs higher than those with Intellectual Disability (previously referred to as Mental Retardation)," but "they perform on a day-to-day, practical basis just like those with Intellectual Disability." (ECF No. 22-2 at 31-32.) Second, Dr. Brown reported that "[t]he adaptive assessment results . . . are consistent with the observation in the peer-reviewed literature that adults with FASD function in the real world like children or like Intellectually Disabled individuals, even when IQ falls above the intellectually deficient range." (*Id.* at 116.) And, third, Dr. Connor reported that "multiple informants report that Mr. Burns's day-to-day adaptive functioning is significantly impaired to a level that is well below expectations based on his level of measured intellectual functioning and functionally similar to individuals with intellectual disabilities." (*Id.* at 131.) Given these facts, reasonable jurists could dispute whether Burns's counsel had at least a reasonable basis upon which to move to strike the death penalty.

Accordingly, a Certificate of Appealability is denied as to the remaining grounds in the First Amended Petition.

**VII.    CONCLUSION**

It is therefore ordered that the First Amended Petition (ECF No. 19) is denied.

It is further ordered that the Motion (ECF No. 74) is denied.

It is further ordered that a Certificate of Appealability is granted for ground 1d and denied as to the remaining grounds.

It is further kindly ordered that the Clerk of Court (1) substitute Jeremy Bean for Respondent Warden Russell, (2) enter judgment accordingly, and (3) close this case.

DATED THIS 30th Day of July 2025.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

46